**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **CYNTHIA SCRUGGS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 3:07-0923** |
| ) | **Judge Echols** |
| **TRW AUTOMOTIVE U.S. LLC,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM

This is an employment discrimination action which alleges violation of the Tennessee Human Rights Act, T.C.A. § 4-21-101 *et seq.* ("THRA") and the Tennessee Handicap Act, T.C.A. § 8-50-103, *et seq* ("THA"). The case was originally filed in the Circuit Court for Wilson County, Tennessee and removed by Defendant to this Court.

Pending before the Court is Defendant TRW Automotive U.S., LLC's ("TRW's") Motion for Summary Judgment (Docket Entry No. 33), to which Plaintiff Cynthia Scruggs ("Scruggs") has responded in opposition (Docket Entry No. 46), and TRW has replied (Docket Entry No. 54). Also pending is Defendant's Motion to Strike (Docket Entry No. 51) portions of certain Affidavits filed on behalf of Plaintiff, to which Plaintiff has responded in opposition (Docket Entry No. 58).

Finally, Plaintiff has filed a "First Motion for Court to Suspend Local Rule 56.01(c)" (Docket Entry No. 57). Defendant has filed a response indicating no objection to the Motion. (Docket Entry No. 60).

## I. FACTUAL BACKGROUND

Plaintiff alleges she has been subjected to discrimination while employed at TRW. She claims that she suffered disparate treatment in the form of workload discrimination and favoritism

2

towards male employees. She also claims that TRW applied its vacation policy in a discriminatory fashion. Finally, Plaintiff alleges she was forced to work in a hostile work environment and suffered retaliation when she complained about the environment. To place those claims in perspective, the Court will begin with the basic background facts, followed by the facts as they relate to Plaintiff's claims relating to the application of the vacation policy, the alleged difference in treatment and work assignments, and the alleged hostile work environment and subsequent retaliation.

## A. **General Background Facts**

TRW is a first tier supplier of parts to the automotive industry. It has a plant in Lebanon, Tennessee which manufactures commercial steering assemblies, primarily for use in heavy trucks and buses.

Plaintiff began working at TRW's Lebanon, Tennessee facility in 1994 as a second-shift production worker. In 1998, Plaintiff applied for, and was accepted into, a four-year, company-sponsored apprenticeship program which enabled her to obtain certification from the United States Department of Labor in machine repair. Plaintiff was the first female to complete the apprenticeship program at the Lebanon plant, which she did in May 2002.

Upon her completion of the apprenticeship program, Plaintiff was promoted to the job category of Machine Repairer A. She remains in that position and receives $21.17 per hour, the highest rate of pay for a bargaining unit employee. Throughout her employment, Plaintiff has performed her job well and has never been disciplined, except for once in July 2008 when she allegedly was found copying company documents for use in this lawsuit.

Plaintiff has been a member of the International Union of United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), Local No. 342 (the "Union"), since 1994. The

Union is the certified collective bargaining agent for all production and Machine Repairers at TRW's Lebanon, Tennessee facility.

The Union and TRW are parties to a collective bargaining agreement ("CBA") that governs terms and conditions of employment with respect to bargaining unit members. Several of the provisions of the CBA are relevant in this case.

Generally, the CBA provides that the right to assign work and determine the number of hours to be worked is retained by management. (Pf. Depo., Ex. 3, CBA Art. II, Sec. 1). The CBA also sets forth the major departments within the plant and provides that if there is a change of departments, or rearrangement or elimination of an existing department, such changes will be discussed by the company with the union. (Id. Art. V, Sec. 3). If an employee has a dispute with the Company about "the application, interpretation or compliance by the Company with the provisions of the Agreement," the employee is required to submit to the mandatory grievance and arbitration procedures set forth in Article IV of the CBA. (Id. Art. IV, Sec. 1)).

Article V of the CBA contains provisions relating to the filling of positions based upon seniority. Specifically, Article V provides:

> During the period of a [job] posting, the senior employees within the job classification, department, and shift requesting an opening will be assigned to it; and the employee filling the posted opening will go to the open job. All job vacancies created by filling a posted job shall be filled by award from the pre-bids for such jobs then on file with the Company . . . . Awards from the pre-bids will be governed by seniority.

(Pf. Depo. Ex. 3, CBA Article V, Section 13).

Article VIII of the CBA deals with employees' paid vacations and establishes a procedure for vacation scheduling on the basis of seniority. With respect to short term or "day-at-a-time" vacation, Article VIII provides:

All eligible employees may elect to use vacation one day-at-a-time. Such vacation must be scheduled with and have the approval of the employee's immediate supervisor at least 20 hours in advance of the requested vacation. After daily vacation has been scheduled for 24 hours, a more senior employee cannot bump the employee out of a scheduled day. Day-at-a-time vacation can only be scheduled seven (7) days in advance. The Company will allow a minimum of 5% total absence rate per department per shift.

(Id. Art. VIII, Sec. 1). Thus, under the CBA, once vacation has been scheduled for twenty-four hours, a more senior employee cannot bump an employee out of a scheduled day off and the vacation request is considered to be "locked in" under TRW policy.

Notwithstanding this provision, TRW is not required to allow employees to take requested vacation days if doing so would result in an absence rate of more than 5 percent per department per shift. This standard is known as the "5 percent rule." If the 5 percent rule is invoked, employees who have "locked in" vacation may be required to work and those employees with the least seniority will be required to work first.

Finally, the CBA defines seniority as "the length of continuous service with the Company at the Lebanon, Tennessee, plant of each employee other than in a classification within the Skilled Trades Group since his latest hiring date." (Id. CBA Art V, Sec. 1). "Seniority of employees within the Skilled Trades Group is governed by the Skilled Trades Supplement to this Agreement and seniority shall be separately accumulated and applied either outside the Skilled Trades Group or within the Skilled Trades Group as the case may be." (Id.).

**B. Facts Relating to Denial of Vacation**

In late May 2006, Plaintiff put in a request to take vacation on June 16, 2006. At that time, another employee, Gary Long ("Long"), who had more seniority than Plaintiff, also requested to take vacation on June 16, 2006. Both Scruggs' and Long's vacation requests were approved and "locked in" under the CBA. As June 16 neared, Randy Scurlock ("Scurlock"), Plaintiff's and Long's

5

supervisor, invoked the 5 percent rule,[1] which would have allowed only one employee to take vacation. Because Long had more seniority than Plaintiff, he was allowed to take vacation and Plaintiff was told she needed to work. Plaintiff complained to Scurlock to no avail. Nevertheless, she took the day off so she could see her son depart for Afghanistan and was not disciplined in any way since she had more than a 98 percent attendance record.

The following Fourth of July weekend, seven Machine Repairers were permitted by the company to take vacation days because there was reduction in manufacturing production due to the holiday. This amounted to a waiver of the 5 percent rule, but it was not a decision made by Scurlock. While Plaintiff did not request vacation that weekend she did not want to work. She filed a grievance because she had been denied her vacation request for June 16, 2006, even though it had been "locked in" yet several employees were allowed to take vacation days the Fourth of July weekend. She asserted that her treatment was unfair because Scurlock arbitrarily invoked the 5 percent rule to rescind her scheduled vacation day, but declined to apply the rule the following weekend so that numerous employees could take vacation. Plaintiff's grievance was eventually withdrawn by the union without prejudice.

## C. Facts Relating to Work Assignments and Treatment

As a Machine Repairer, Plaintiff is required to repair and otherwise maintain TRW's production machines and the plant facility. When Plaintiff began working as a Machine Repairer, there were over forty Machine Repairers in TRW's Lebanon facility, enough for each Machine Repairer to be partnered with another within his or her department. Since 2002, however, production

---

[1] The Court notes that Plaintiff disputes whether the 5 percent rule was actually invoked since strict application of the rule in Plaintiff's department would mean that no one could ever take vacation because even one person on leave would constitute more than five percent of the work force.

6

at the facility has declined and maintenance jobs have been eliminated through attrition. Now, there are approximately twenty-six Machine Repairers in the plant, twelve of whom work with Plaintiff on the first shift.[2] Of those twelve, eight are assigned to specific work areas and the other four act as "floaters" and work in areas needing assistance.

The Maintenance Coordinator is responsible for assigning work to the Machine Repairers. Generally, maintenance work is distributed on a departmental basis, meaning that if a machine in a certain work area needs repairing, the Machine Repairer responsible for that department or work area will be assigned to repair the machine. If no repair work is needed in a Machine Repairer's assigned area, he or she will typically remain in that work area, rather than work in another department. However, a Maintenance Coordinator may pull a Machine Repairer out of his or her department to perform work in another area.

In 2002, Plaintiff bid on and received, based on her seniority, a first-shift maintenance position in the housing department, known as Department 2200 at the TRW facility, where she worked until August 2007. The housing department makes shells or "housings" for steering gears to be used in buses, trucks, and recreational vehicles. Those housings can be very heavy.

Initially, Plaintiff worked in the housing department with three other Machine Repairers. However, when one of the Machine Repairers left the Department in 2002, he was not replaced.

From May 2006 until July 2007, Plaintiff's immediate supervisor was Scurlock. By the time Scurlock became Plaintiff's supervisor, only Plaintiff and Martin ("Martin") were working as Machine Repairers on the first shift in Department 2200. Plaintiff's claim of workplace discrimination arises from the time she worked under Scurlock's direction.

---

[2]There are two other shifts at the plant.

7

Plaintiff claims that Department 2200 is much larger than the other departments and consequently has more machines, both in terms of numbers and variety. Plaintiff also claims that the machines in Department 2200 are older than in the other departments and consequently more prone to need repair and more difficult to repair.

Within Department 2200, Plaintiff claims she was responsible for overseeing the operation of 53 machines of nine different types. In contrast, Martin, her co-Machine Repairer on the first shift in Department 2200, was only responsible for maintaining seven machines.[3]

Machine repairers are supposed to record their work orders into a program called Maximo and the time reported could be from minutes to many hours. However, Plaintiff cannot say whether other Machine Repairers accurately recorded their work in Maximo and the time they spent in fixing a machine. In any event, TRW maintains that Maximo is not a tool for tracking employee performance, but instead is a system used for tracking the maintenance and repair status of machines being worked on and for use in comparing maintenance needs between departments. Minor repairs or adjustments to a machine are less likely to be entered into Maximo. For these reasons, the parties agree that the number of work orders entered into TRW's Maximo system is not necessarily a reliable or accurate reflection of the amount of work performed by an employee and is subject to manipulation by the person inputting the information. Further, because Machine Repairers are paid based upon the number of hours worked, their pay is not reflected by the number of hours logged in the Maximo system.

_____

[3]For a period of time that Plaintiff was under medical restrictions, she was assisted by a helper named Aaron Woolard. However, Plaintiff claims that Woolard was of little real help and, at times, made more work for Plaintiff because Plaintiff would have go back and correct his mistakes. Plaintiff's complaints to Scurlock about Woolard went nowhere, and Scurlock would sometimes laugh at Woolard's efforts.

Despite being less than entirely accurate, the Maximo records from January 2007 through July 2007, a time during which Plaintiff claims she was given an inordinate amount of work, indicate that Plaintiff in fact performed fewer work orders and worked fewer hours than many male Machine Repairers. These would include Machine Repairers Bryan Butler ("Butler"), and Anthony Dwayne Moore ("Moore"). In fact, according to Maximo, Plaintiff spent fewer hours working on machines during each month from January 2007 to July 2007 than at least one male Machine Repairer.

In response to these records, Plaintiff notes that the Maximo records are not necessarily accurate. Further, Plaintiff points out she was required to work on more and different types of machines than the male Machine Repairers (53 different machines comprising nine different types) and, for the first two months of 2007, she was under medical restrictions but assigned an ineffectual helper.

Plaintiff's medical restrictions arose as a result of a leg injury she received on the job in August 2006. At the time, Plaintiff was fixing a machine in Department 2200 which had a heavy door which kept falling off. Despite repeated efforts to fix the problem, the door kept falling off. Plaintiff claims she told Scurlock the door was too heavy to lift by herself, but he refused to provide any assistance, even though one maintenance worker was either sleeping or "resting his eyelids" in Scurlock's office while Plaintiff was working on the door. When Scurlock refused to provide assistance, Glenda Pitts ("Pitts"), the Department Coordinator in Department 2200, provided two line workers to help Plaintiff. Nevertheless, Plaintiff claims that she was injured when she was struggling to fix the door by herself.

After Plaintiff was injured, she was off work for several months. Plaintiff claims that during her absence, two Machine Repairers were assigned her duties. However, TRW claims those repairers were floaters, and neither worked full time in fixing Plaintiff's machines.

9

When Plaintiff was able to return to work, she claims that she still had obvious difficulty walking, but was nevertheless overloaded with work by Scurlock. She also claims that during this period Pitts asked two journeymen who were going to the break room if they were busy, and when they responded "no, not really," Pitts asked them to help Plaintiff. Instead of helping Plaintiff, the journeyman said "aw, she'll get it" (Pitts Aff. ¶ 20).

More generally, Plaintiff claims that Scurlock treated males differently than females. In this regard she claims that Scurlock often "looked the other way" when men were taking longer breaks than permitted by rule and when men were tardy for work. She also alleges Scurlock allowed some men to go to the break room to eat breakfast before beginning their work shift, but did not do so with female employees. Plaintiff admits that some of this treatment may be due to the fact that Scurlock worked with some of the male employees at another company.

As further evidence of different treatment, Plaintiff claims that Scurlock would place work orders on her tool box, even at times when she was otherwise occupied repairing machinery. She also claims that when Scurlock rode through Department 2200 on a powered cart, he would turn his head so as to avoid looking at Plaintiff.

During the time when she alleged a discriminatory workload under Scurlock, Plaintiff did not request a transfer, although she had sufficient departmental seniority to do so. When Plaintiff later sought a transfer in August 2007 from the housing department to the so-called "easier" assignment of facilities maintenance, her transfer request was granted. As of August 2008, Scurlock once again became Plaintiff's supervisor.

**D. Facts Relating to Alleged Harassment and Retaliation**

TRW maintains a written policy prohibiting sexual harassment in all forms. Plaintiff received a copy of the policy and the policy is periodically reviewed with all employees.

10

Specifically, the harassment policy prohibits "any unwanted sexual advances, requests for sexual favors or visual, verbal or physical conduct of a sexual nature when . . . such conduct has the purpose or effect of unreasonably interfering with an employee's work performance or creating an intimidating, hostile or offensive working environment." (Pf. Depo., Ex. 4). By way of example, the policy states that the company will not tolerate "visual conduct such as leering, making sexual gestures, displaying sexually suggestive objects or pictures, cartoons, calendars or posters." (Id. Depo., Ex. 4). The policy also states, "Any employee who believes he or she has been subjected to harassment prohibited by this policy must immediately report the harassing behavior, preferably in writing, to his or her coordinator, the local Human Resources Manager, a Group or Product Line Human Resources Director or Vice President, any other Human Resources Department representative with whom the employee works, or through the TRW Automotive Integrity Help Line." (Id.) The policy further provides that if the company is made aware of a situation that may violate the policy, the company will "conduct a prompt, thorough and objective investigation of any harassment claims." (Id.).

The harassment policy is posted on the company bulletin board, along with the telephone number for the Integrity Help Line, also known as the discrimination "hotline," which employees are encouraged to call if they have complaints under the policy. Plaintiff claims, however, that at some point in time this information was removed from the company bulletin board, or at the very least she has not seen it posted recently.[4]

In August 2007, Plaintiff discovered a pornographic magazine while she was searching in the maintenance library for a machine schematic. The maintenance library contains a separate,

_____

[4]Plaintiff called the hotline once in the late 1990's to complain about not being selected for a skilled trades apprenticeship program which she thought she should have received due to her test scores.

11

unisex bathroom which is accessible by a door inside the library. The door to the document library was not kept locked; however, no one other than supervisors, engineers and maintenance personnel had a business purpose in using the library. The magazine, which contained explicit sexual conduct, was lying open in a file drawer that contained information about the machine on which Plaintiff was working and could have been placed there by a maintenance department employee who would be able to look up which machine Plaintiff was scheduled to repair and then place the magazine where the schematics would be for that particular machine. Upon discovering the magazine, Plaintiff claims she was humiliated, particularly since she was the only female in the department.

When Plaintiff discovered the magazine, she immediately found Michael McCullough ("McCullough"), who was serving as her coordinator that day because Plaintiff's regular coordinator, James Ellis ("Ellis"), was on vacation. Plaintiff told McCullough about the magazine and that she had seen "inappropriate" magazines lying out in the open on prior occasions. Plaintiff did not know who placed the magazine in the drawer, but stated that it was "probably one of the maintenance guys that sits up there on their ass when they should be working," most likely a worker in the maintenance department on the third shift.

Plaintiff and McCullough went to Tim Saylors ("Saylors"), HR Representative, and informed him of the situation. Plaintiff told Saylors there had been a similar incident in the prior year that she reported, but when Saylors asked Plaintiff to identify who she had reported the incident to, Plaintiff either said it did not matter who she reported it to, or that she could not recall who she reported it to. Saylors also asked Plaintiff if she knew who placed the magazine in the maintenance file drawer, but Plaintiff did not know and did not identify anyone. After Saylors interviewed Plaintiff and documented her complaint, he informed her that he would make sure the maintenance library was cleared of any inappropriate materials. Plaintiff believes Saylors took her complaint seriously.

12

Subsequently, McCullough and Leo Noonan ("Noonan"), TRW's Business Unit Manager, gathered the plant engineers and conducted a "sweep" of the area, drawer by drawer, to remove any and all objectionable materials. The sweep revealed a second magazine which was "sexually graphic."

After this sweep was conducted, shift coordinators conducted shift meetings with their employees and informed them that a sexually explicit magazine had been found in the facility and that such materials were inappropriate in the workplace and prohibited by TRW policy. TRW did not seek to discover who left the magazine in the maintenance library since TRW claims it was accessible to more than 500 employees and it would have been unreasonable to question all of the employees. While Plaintiff was not identified as the person who had lodged a complaint, Plaintiff believes that word of her involvement leaked out to her coworkers.

After this incident and TRW's response, Plaintiff never discovered any materials that contained sexually explicit content. However, in January 2008, while looking in a maintenance cabinet in the compressor room, Plaintiff discovered a magazine which had a woman on the cover revealing "flesh." Plaintiff did not open the magazine. The magazine at issue was FHM which featured a picture of Pamela Anderson in a swimsuit on the front cover.

Plaintiff reported this incident to Ellis, who in turn took Plaintiff to Human Resources. Shortly thereafter, Noonan called a meeting and informed the employees that a magazine had been found in the facility and that suggestive materials were unacceptable in the workplace. Noonan asked the maintenance department employees to review the policy relating to sexual harassment and sign and acknowledge that they had done so. Upon being asked who had complained about the magazine, Noonan replied that he could not tell them who had complained. Nevertheless Plaintiff contends it was pretty obvious that she was the one who complained since she was the only female

13

in attendance at the meeting which was held in a small room. Plaintiff claims that some of the men in attendance were laughing and asked what was wrong with the magazine and some refused to sign an acknowledgment about the sexual harassment policy. Nevertheless, since January 2008, Plaintiff has not reported finding any other material which she views to be objectionable.

Magazines such as Maxim, FHM, and Cosmo can be found at TRW. While Scurlock was supervisor, he never removed such magazines from the workplace. However, Pitt would remove such material if she discovered it in the workplace.

Plaintiff claims she reported seeing inappropriate magazines before August 2007. However, Plaintiff could not state when the complaints were made, what the content of those complaints were, or to whom she had made the complaints, other than she complained to Human Resources.[5] Plaintiff generally claims that when she did complain about something, it fell on deaf ears. At some point in her employment, Plaintiff took photographs of magazines whose covers she found objectionable. These included photographs of the covers of "Cosmopolitan," "Maxim," and "Stuff" magazines.

Plaintiff alleges that after she complained about the alleged harassment, her co-workers "ostracized" or "shunned" her and were angry at her. She claims that some co-workers do not talk with her or eat lunch with her as before.

## II. <u>APPLICATION OF LAW</u>

### A. <u>Motion to Suspend Local Rule</u>

By way of this Motion, Plaintiff seeks to suspend Local Rule 56.01 insofar as it provides that unless a party opposing a motion for summary judgment timely responds to each statement of fact

---

[5]TRW asserts that it keeps copies of all written complaints. The only complaints by Plaintiff that TRW has in its records relate to Plaintiff's June 2006 vacation grievance, and to her complaints about discovering magazines in August 2007 and January 2008.

set forth by the movant (L.R. 56.01(c), the facts are deemed to be undisputed (L.R. 56.01(g)). In an accompanying Affidavit, Plaintiff's counsel indicates he timely prepared responses to the concise statement of facts set forth by Defendant, but, through a mistake, Plaintiff's concise statement of facts was filed without the accompanying responses when she filed her opposition papers to Defendant's Motion for Summary Judgment. It was only when Defendant asserted in its reply brief that the facts it had presented should be deemed undisputed that Plaintiff discovered the mistake. Plaintiff immediately filed the version containing her responses to Defendant's statement of facts.

In light of counsel's representations, Defendant has no objection to the suspension of the operation of Rule 56.01(g). The Court also believes that the circumstances warrant consideration of Plaintiff's responses to Defendant's concise statement of facts and accordingly , Plaintiff's Motion to Suspend Local Rule 56.01 will be granted in this case.

## B. Motion to Strike

Defendant has filed a Motion to Strike various portions of Affidavits submitted on behalf of Plaintiff. As a general proposition, motions to strike are disfavored. See, Heller Fin., Inc. v. Midwhey Powder Co., 883 F.2d 1286, 1294 (7th Cir. 1989). Such motions should be granted only "in extraordinary circumstances," such as where "the document is redundant, immaterial, impertinent, or scandalous and this document has caused some prejudice to the opposing party." Reyes v. Seaton Ent., LLC, 2008 WL 400452 at *6 (E.D. Tenn. 2008). None of the objected-to portions of the Affidavit meet this criteria.

In setting forth the facts in this Memorandum, the Court has considered all of the submitted Affidavits only to the extent that they are based on personal knowledge and set forth facts as would otherwise be admissible in accordance with Rule 56(e) of the Federal Rules of Civil Procedure.

15

Having said that, the Court makes the following observations with respect to Defendant's Motion to Strike.

## 1. <u>Sandra Fain's Affidavit</u>

Defendant seeks to strike Paragraph 5 of Sandra Fain's ("Fain's") Affidavit. In that paragraph, Fain, who previously worked under Scurlock, states that she "had heard from other women at TRW before I was allowed to go back to full duty work following my injury that Mr. Scurlock always made sure women under his supervision were working hard, while allowing males under his supervision to 'goof off.'" (Fain Aff. ¶ 5).

While that statement is obviously hearsay, it must be read in context. In the following paragraph, Fain states that she "personally learned the statements in the immediately preceding paragraph to be true on only my second day back from my work injury." Fain goes on to state that she asked Scurlock for help since she was not up to par, but Scurlock refused and told her to "just do her job." (<u>Id</u>. ¶ 6). Read in context, Paragraph 5 can be seen as not a statement about the truth of the matter asserted (i.e. that Scurlock worked women harder than men), but rather to show why Fain was paying attention to how Scurlock reacted when she came back to work.

## 2. <u>Glenda Pitts' Affidavit</u>

Defendant seeks to strike Paragraphs 3 and 4 of Pitts' Affidavit. In those paragraphs, Pitts states that she is female, was employed by Defendant for 13 years, that she was discriminated against on the basis of gender while employed by Defendant, and was discharged in retaliation for having filed a charge of discrimination. Insofar as Pitts states she was discriminated and retaliated against, these are conclusory and legal statements. Plaintiff does not object to the Court not considering these statements in ruling on the Motion for Summary Judgment and the Court will in fact ignore those statements.

16

Defendant also seeks to strike Paragraphs 15, 16, 17 & 20 of Pitts' Affidavit. Those paragraphs state:

> 15. I also witnessed Randy Scurlock, during the time Mr. Scurlock was Coordinator of the maintenance department, mistreat Ms. Scruggs and/or treat her improperly. Specifically, it was a regular occurrence for Mr. Scurlock to be riding through area 2200 on a powered cart, and intentionally turn his head to look away from Ms. Scruggs.
>
> 16. Moreover, I witnessed Mr. Scurlock often put multiple work orders on Ms. Scruggs' tool box, even at times when she was otherwise occupied repairing machines. On such occasions, I heard her ask Mr. Scurlock for help, and thereafter I never saw any help appear for Ms. Scruggs on even a single occasion.
>
> 17. In addition, I have never seen Mr. Scurlock himself give Ms. Scruggs any assistance, even after her asking him.
>
>          *               *               *
>
> 20. Upon attempting to return to work from her work injury, even when she still had obvious difficulty walking, Ms. Scruggs was overloaded with work orders by Mr. Scurlock. On one occasion before she had fully recovered and while she still had visible difficulty getting around, I personally witnessed two male maintenance technicians/journeymen walking through my department on the way to the back breakroom, and knowing Ms. Scruggs needed help, I asked them if they were busy. They responded, "No, not really." I then said to them, Cyndi needs help." At this, they smirked and said, "Aw, she'll get it."

(Pitts Aff. ¶¶ 15-17, 20).

With respect to all four paragraphs, Defendant asserts Pitts could not have personal knowledge of these events since, during most of the relevant period, she worked the third shift while Plaintiff worked the first shift[6] and, even when they worked the same shift, Plaintiff's work area was not visible to Pitts' office area. Defendant also argues that Pitts never worked in the maintenance department, nor was she supervised by Scurlock. However, these assertions neglect to consider the fact that Pitts states under oath that she heard and saw certain things and that what she says in her

_____

[6]This assertion ignores the fact that the first and third shift apparently overlapped by one hour.

17

Affidavit is based upon personal knowledge.[7]  While Defendant may have contrary evidence, that goes to the weight of Pitts' testimony.  Insofar as the statements contain mere conclusions, the Court will not consider them in ruling on the Motion for Summary Judgment.

### 3.  Susan Boulton's Affidavit

Defendant seeks to strike Paragraph 6 of Susan Boulton's ("Boulton's") Affidavit insofar as it states that "[d]uring the time Mr. Randy Scurlock was my coordinator in 2005 and 2006, he always made sure that the women under his supervision were doing their job, but did not do so with men under his supervision."  Defendant argues that the statement is conclusory and not competent evidence for purposes of summary judgment because it "provides no names, specific dates or specific details about this allegation."  (Docket Entry No. 52 at 7).  While that may be true, Boulton goes on to give specifics by stating that "I saw on many occasions Mr. Scurlock 'look the other way' when men were taking longer breaks than permitted by rule; when men were tardy for work, Mr. Scurlock allowed some men to go to the break room to eat breakfast before beginning their work shift."  (Boulton Aff. ¶ 6).  While such statements would be subject to fleshing out at a trial, the Court need not ignore what Boulton generally claims she saw, to wit, that Scurlock tended to ignore infractions by men.

Defendant also seeks to strike Boulton's statement in Paragraph 8 of her Affidavit that "[o]n the day that [Plaintiff] was injured, she had requested help from Randy Scurlock, but no help appeared prior to the time she was injured."  (Id. ¶ 8).  While the Court agrees with Defendant that Boulton does not specifically say whether she saw or heard Plaintiff request help, Boulton does state

---

[7]Whether Scurlock "intentionally" turned his head away while riding in a cart past Plaintiff is, of course, something which Pitts could never know since it goes to Scurlock's state of mind. However, the point remains that Pitts claims Scurlock would turn his head when he rode past Plaintiff.

18

that her Affidavit is based upon personal knowledge. Moreover, this objection in largely irrelevant since Plaintiff herself claims she asked for help and did not receive it and thus the Court must accept as a given for purposes of summary judgment that Plaintiff did in fact ask for help upon her return to work from her injury. (Pf. Depo. at 242-243).

### 4. Teresa Key's Affidavit

Finally, Defendant seeks to strike Paragraphs 5 through 7 of Teresa Key's ("Key's") Affidavit. In those paragraphs, Keys states that she was fired in November 2006 for "poor attendance," that she had a 95% attendance record, that male employees with a worse attendance record were not terminated, and that she filed a grievance about her termination which led to her being reinstated. Defendant claims that this is improper "me too" evidence of discrimination. However, the statements made by Keys in paragraphs 5 through 7 of her Affidavit are not relevant to this Court's determination of the summary judgment motion and therefore are not being considered by the Court in its ruling.

## C. Summary Judgment Motion

As indicated, Plaintiff sues TRW for alleged violations of the THA and the THRA. Those claims will be considered after a review of the standards governing summary judgment motions.

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson

v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### 1. **THA Claim**

In her Amended Complaint, Plaintiff alleges that the conduct of the Defendant violated the THA. However, she offers no facts which would support such a claim and makes no arguments in her response to Defendant's motion for summary judgment relating to a claim under the THA.

The THA provides "[t]here shall be no discrimination in the hiring, firing and other terms and conditions of employment of . . . any private employer . . . based solely upon any physical, mental or visual handicap[.]" T.C.A. § 8-50-103(a). "An individual alleging handicap discrimination under the THA must demonstrate: (1) that she was qualified for the position; (2) that she was disabled; and (3) that she suffered an adverse employment action because of that disability." Oates v. Chattanooga Pub. Co., 205 S.W.3d 418, 424 (Tenn. Ct. App. 2006). With regard to the term handicapped or disabled, the Tennessee Supreme Court looks to the THRA which defines

20

"handicap" as "(i) A physical or mental impairment which substantially limits one (1) or more of such person's major life activities; (ii) A record of having such an impairment; or (iii) Being regarded as having such an impairment.'" Barnes v. Goodyear Tire and Rubber Co., 48 S.W.3d 698, 706 (Tenn. 2000) (quoting, T.C.A. § 4-21-102(9)(A)).

In this case, while the evidence shows Plaintiff was out of work for a period due to the injury that she received when a machine door fell on her, she has presented absolutely no evidence that she was physically or mentally impaired to the extent that she was substantially limited in a major life activity. Nor has Plaintiff provided any evidence which would suggest that TRW considered her as having a handicap or disability. As such, summary judgment will be granted in favor of Defendant on Plaintiff's THA claim.

### 2. THRA Claims

Plaintiff claims she was subjected to disparate treatment in relation to her vacation requests and her workload. Plaintiff also claims that she was required to work in a hostile work environment and subjected to retaliation when she complained about the environment.

#### a. Disparate Treatment Claims

Claims under the THRA are analyzed the same as claims brought under Title VII. Frizell v. Southwest Motor Freight, 154 F.3d 641, 646-47 (6th Cir. 1998); Campbell v. Florida Steel Corp., 919 S.W.2d 26, 31 (Tenn. 1996)). Disparate treatment occurs when an employer treats some employees less favorably than others based upon a protected classification such as sex. Hughley v. General Motors Corp., 52 F.3d 1364, 1370 (6th Cir. 1995). Such claims can be established through either direct or circumstantial evidence.

Where, as here, a Plaintiff is seeking to establish disparate treatment using circumstantial evidence, a Plaintiff must first establish a *prima facie* case by showing (1) membership in a

protected class, (2) an adverse employment action, (3) qualification, and (4) replacement by one outside of the protected class or dissimilar treatment to one similarly situated. See, Clayton v. Meijer, Inc., 281 F.3d 605, 610 (6th Cir. 2002); Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir. 1992). Upon such a showing, a defendant may rebut the presumption of discrimination by proffering a legitimate, nondiscriminatory reason for its decision, with the plaintiff then bearing the burden of showing that the defendant's proffered reason is pretextual. Dews v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000). "A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." Id.

### i. Vacation

Plaintiff alleges she was treated differently because of her sex when her request to take a vacation day on June 16, 2006 was denied but seven male employees were allowed to take vacations during the following Fourth of July holiday period. This claim fails for three reasons.

First, Plaintiff's claim relating to alleged discrimination in regard to the denial of vacation time is barred by the statute of limitations. Claims under the THRA are subject to the one-year limitations period set forth in T.C.A. § 4-21-311(d), Dorris v. Dell Products, L.P., 2006 WL 1788186 at *6 (M.D. Tenn. 2006), which provides that an action must be filed "within one (1) year of the alleged discriminatory act." T.C.A. § 4-21-311(d). The allegedly discriminatory act "ceases" and the statute begins running "as of the time it occurs, not as of the time the consequence of the act cease." Cline v. BWXT Y-12, LLC, 521 F.3d 507, 511 (6th Cir. 2008).

The Complaint in this case was filed on August 13, 2007. The alleged conduct about which Plaintiff complains occurred on June 16, 2006 and therefore Plaintiff's claim of disparate treatment

in relation to the denial of vacation is barred by the one-year statute of limitations which governs THRA claims.

Second, Plaintiff's THRA claim relating to vacation pay is preempted by Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. Section 301 of the LMRA relates to suits for violations of contracts between an employer and a labor organization representing employees. The statute "preempts state-law claims for what are in actuality suits for violation of contracts between an employer and a labor organization," with the goal being to insure uniform interpretation of CBAs. Valinski v. Detroit Edison, 197 Fed. Appx. 403, 407 (6th Cir. 2006) (citing, Caterpillar, Inc. v. Williams, 482 U.S. 386, 392 (1987); Local 174, Teamsters v. Lucas Flour Co., 369 U.S. 95, 103-04 (1962)).

A two-step inquiry is used to determine whether a state-law claim is preempted by Section 301. The Sixth Circuit has articulated that inquiry as follows:

> First, courts must determine whether resolving the state-law claim would require interpretation of the terms of the collective bargaining agreement. If so, the claim is preempted. Second, courts must ascertain whether the rights claimed by the plaintiff were created by the collective bargaining agreement, or instead by state law. . . . If the rights were created by the collective bargaining agreement, the claim is preempted. In short, if a state-law claim fails either of these two requirements, it is preempted by § 301.

Mattis v. Massman, 355 F.3d 902, 906 (6th Cir. 2004)(internal citation omitted).

In this case, Plaintiff asserts that her "locked in" vacation time was revoked in favor of a co-worker who Defendant asserts had more seniority. She also claims that during the following weekend, which covered the Fourth of July, the 5 percent rule was overlooked or suspended so that seven males could take vacation. She also argues that implementation of the 5 percent rule makes no sense in relation to the Machine Repairers in Department 2200 because there are only two such employees and anytime one takes vacation there is a violation of the rule.

Resolution of Plaintiff's claims and arguments relating to the taking of vacation necessarily would require interpretation of the CBA. Specifically, the Court would be required to interpret the 5 percent rule and decide whether the fact Plaintiff was bumped out of her vacation day on the basis of seniority was somehow discriminatory. This in turn would require the Court to determine seniority under the CBA and the skilled trades supplement to the CBA in order to ascertain Plaintiff's seniority in relation to a male co-worker. Additionally, the Court would have to interpret Article VIII of the CBA as it relates to the taking of "short term" or a "day-at-a-time" vacation. Moreover, the right to, and scheduling of, vacation is provided by the CBA and Plaintiff has pointed to no state law which indicates Plaintiff's entitlement to vacation.

Third, Plaintiff's vacation claim fails on the merits. In order to establish a disparate treatment claim, Plaintiff must show an adverse employment action. Here, the undisputed record is that while Plaintiff's request for vacation on June 16, 2006 was rescinded, Plaintiff nevertheless took that day off and was not disciplined for so doing. Plaintiff also did not request the Fourth of July weekend off as had the male employees who took vacation that day. Accordingly, her vacation claim will be dismissed.

### ii. Workload and Other Treatment

Plaintiff claims she was subject to disparate treatment in regard to her workload. She also claims disparate treatment in that some males were allowed to "goof off" or take breaks and generally were not required to work as hard as female employees.

To some extent, Plaintiff's claims about the difference in treatment relative to workloads is preempted by the CBA. To adjudicate the claim, the Court would be required to interpret the CBA and specifically Article II, Sec. 1 which reserves to management the right to "assign work and determine the number of hours worked."

24

Regardless, Plaintiff's claim is broader than merely a violation of the CBA in regard to her workload. She is claiming that she was forced to work harder than males and that this was because she was female. However, even when viewed under the THRA, Plaintiff has forwarded insufficient evidence to require trial on such a claim.

As indicated, to establish a prima facie case of discrimination, Plaintiff must show that she was treated differently than similarly situated male employees. Plaintiff must also show she suffered an adverse employment action.

The crux of Plaintiff's workload discrimination claim centers on her "belief" that she was required to work harder than male Machine Repairers and in particular Martin who was also assigned to Dept. 2200 as a Machine Repairer. However, her mere subjective beliefs are insufficient to establish a genuine issue of material fact so as to warrant trial. See, Mitchell, 964 F.2d, at 584; Maclin v. SBC Ameritech, 520 F.3d 781, 789 (7th Cir. 2008). Likewise, the Affidavits that Plaintiff files in support of her claim of workload discrimination fail to establish workload discrimination because none of the affiants show any personal knowledge about the work performed by Machine Repairers within the various departments. Fain merely states that she saw men "goofing off or not working." (Fain Aff. ¶ 9). Pitts claims Scurlock "mistreated" Plaintiff and would place "multiple work orders on Ms. Scruggs' tool box, even at times when she was otherwise occupied repairing machines" and not look at her when he drove by on an electric car (Pitts. Aff. ¶¶ 15-16). Boulton merely alleges that Scurlock allowed men to take longer breaks or eat breakfast before their shifts. None of these affidavits constitute evidence of the amount of work Plaintiff performed in comparison to male Machine Repairers.[8]

---

[8]The Court rejects TRW's assertion that Plaintiff cannot show an adverse employment action merely because she was required to work harder than her male counterparts. While it is true that a

25

The only concrete evidence of worked performed by Machine Repairers which has been presented to the Court is the records from the Maximo system. As indicated, this system is not entirely accurate. Nevertheless, Plaintiff herself states in her Affidavit that "most machine repairers are taught to and do create an entry in Maximo every time they perform maintenance work on [a] machine."[9] To the extent that Maximo records can be looked to as showing the relative workload of the Machine Repairers, those records do not support Plaintiff's claim that she was treated differently than male employees by being given more work. Rather, those records show that during the relevant period of January 2007 through July 2007, many male Machine Repairers completed more work orders and/or spent more hours completing work orders than did Plaintiff. Specifically, Butler completed more work orders than Plaintiff and spent more hours completing work orders than Plaintiff in each month from January 2007 through May 2007. Machine Repairer Moore spent more hours completing work orders than did Plaintiff in January, February, March, and April 2007. In June 2007, five first-shift male Machine Repairers spent more hours completing work orders than did Plaintiff, and in July 2007, three male Machine Repairers spent more time completing work orders. According to Maximo records, in every month from January 2007 through July 2007, Plaintiff worked fewer hours than at least one similarly situated male Machine Repairer.

---

mere inconvenience or an alteration of job responsibilities does not amount to an adverse employment action, it does not follow perforce that an increase in workload cannot constitute an adverse employment action. It is possible for an employer to discriminate or retaliate against an employee by giving that employee an onerous workload. See, Ford v. Gen'l Motors Corp., 305 F.3d 545, 553 (6th Cir. 2002).

[9]Plaintiff goes on to explain that this generally holds true because a Machine Repairer cannot take any parts out or the parts crib without there being a written work order which is tracked through the Maximo system.

Plaintiff also claims that because there were a greater number of machines in Department 2200 and these machines were older, this somehow shows that she was required to work more. The Court rejects this argument because Plaintiff has not shown that the number of machines in Department 2200 or the age of those machines correlated into more work for Plaintiff in relation to the male Machine Repairers. Besides, work done by Machine Repairers is based upon the location of the machines and Plaintiff voluntarily moved into Department 2200 based upon her seniority. This suggests that her workload was not based upon her gender.

Plaintiff has simply failed to show that she was treated differently than male Machine Repairers. The only possible exception to this is her contention that Martin, her fellow Machine Repairer in Department 2200, was required to repair and service only seven machines (all of the same type), while she was required to service 53 machines (of nine different varieties). In terms of sheer numbers, this appears to be a significant difference. However, TRW has explained that the machines worked on by Martin required constant maintenance and repair. This is a legitimate non-dscriminatory reason for the difference in treatment between Plaintiff and Martin, and Plaintiff has offered no evidence which would suggest that the proffered reason for the difference in treatment was a lie.

Defendant has also presented evidence which shows that the distribution of work assignments is based on the facility's departmental structure and that if a machine in a certain work area needs repair, the Machine Repairer responsible for machines in that work area will be assigned to repair it. Thus, even if Plaintiff were able to prove that she performed more work than other male Machine Repairers, the reason for any disparity would not be Plaintiff's gender but the simple fact that Plaintiff's assigned area of Department 2200 had more machines in need of repair. Plaintiff

27

offers no evidence disputing this assertion. As such, Plaintiff's claim of workload discrimination will be dismissed.

Plaintiff also argues that she was treated differently than male employees because Scurlock "looked the other way" when some employees took longer breaks and allowed some to eat breakfast before their shift and overlooked tardiness on occasion. Plaintiff also claims Scurlock averted his eyes when he passed Plaintiff while riding the motorized cart.

In order to prevail on her discrimination claim, Plaintiff must show that she suffered a materially adverse employment action. Tepper v. Potter, 505 F.3d 508, 515 (6th Cir. 2007). This means Plaintiff must show that there was "'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Id. quoting, Ford v. Gen'l Motors Corp., 305 F.3d 545, 553 (6th Cir. 2002).

In this case, Plaintiff admits that some of the difference in treatment may have been due to the fact that Scurlock worked with some of the male employees at a different company. This suggests favoritism which, standing alone, is not sufficient to show discrimination. Johnson v. United Parcel Serv., 117 Fed. Appx. 444, 452 (6th Cir. 2004). Regardless, Plaintiff has presented no evidence that she was disciplined for tardiness or absenteeism, or that she was ever denied a requested break. As for Scurlock not looking at her when he passed by on his cart, it suffices to note that petty slights and minor annoyances occur at work and therefore lack the severity to be materially adverse. See, Burlington Northern and Santa Fe Ry. Co. v. White, 126 S.Ct. 2405, 2415 (2006).

### iii. Hostile Work Environment and Retaliation

A hostile work environment arises "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993). "In order to establish a hostile work environment claim, an employee must show the following: 1) the employee is a member of a protected class, 2) the employee was subjected to unwelcome harassment, 3) the harassment was based on the employee's [sex], 4) the harassment affected a term, condition, or privilege of employment and 5) the employer failed to take reasonable care to prevent and correct any harassing behavior." Moore v. KUKA Welding Systems, 171 F.3d 1073, 1078-79 (6th Cir. 1999). Liability may be imposed where a supervisor engages in workplace harassment which leads to a tangible employment action, or where the employer fails to exercise reasonable care to prevent and correct known harassment by a co-worker. See, Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275 (1998); Burlington Industries Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257 (1998).

To determine whether workplace harassment is sufficiently severe or pervasive, the Court is to consider the "totality of the circumstances." Williams v. General Motors, 187 F.3d 553, 562 (6th Cir. 1999). The Court is also required to utilize both an objective and subjective test: "the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard the environment as abusive." Bowman v. Shawnee State Univ., 220 F.3d 456, 462 (6th Cir. 2000). "Appropriate factors for the court to consider when determining whether conduct is severe or persuasive enough to constitute a hostile work environment 'include the frequency of the discriminatory conduct; its severity;

29

whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Id. quoting Harris, 510 U.S. at 23.

In this case, when viewed in light of the totality of the circumstances, Plaintiff cannot show the allegedly harassing conduct was so pervasive or severe as to alter the conditions of her employment. There are only two documented instances of Plaintiff discovering an objectionable magazine, and in only one of those instances was the magazine in question sexually explicit. However, relatively infrequent or isolated incidents are insufficient to constitute changes in the terms and conditions of employment. Bourini v. Bridgestone/ Firestone North Amer. Tire, 136 Fed. Appx. 747, 751 (2005). "While there is no bright-line rule as to what constitutes a hostile work environment, the plaintiff's allegations must depict conduct that could be construed as pervasive enough to alter the conditions of her employment and to create an abusive situation." Clark v. United Parcel Service, Inc., 400 F.3d 341, 351 (6th Cir. 2005). The one occasion where a sexually explicit magazine allegedly was left for Plaintiff to find does not create an abusive situation as required by the law, notwithstanding the presence of such magazines as FHM, Maxim and Cosmopolitan.

Further, upon learning of the existence of the magazines, TRW took remedial action. While Plaintiff complains that the perpetrator was never identified and it became apparent that she was the one who complained, an employer is liable only if its "response manifests indifference or unreasonableness in light of the facts the employer knew or should have known." McCombs v. Meijer, Inc., 395 F.3d 346, 353 (6th Cir. 2005)(citation omitted). This is because the discriminatory act in such situations "is not the harassment, but rather the inappropriate response to the charges of harassment." Id. "Thus, an employer who implements a remedy" is liable "only if that remedy

30

exhibits such indifference as to indicate an attitude of permissiveness that amounts to discrimination." Id.

In this case, TRW hardly exhibited an attitude of permissiveness. When the pornographic magazine was found, engineers searched the area for other such magazines and found one. Shift supervisors then held a meeting with their employees and told them explicit magazines had been found and that such magazines were prohibited in the workplace. When Plaintiff discovered the non-pornographic FHM magazine, Noonan met with the maintenance employees and explained that such materials were inappropriate in the workplace and told the employees to review the harassment policy. After this incident, Plaintiff never again complained about seeing any inappropriate material in the workplace. Summary judgment will be granted on Plaintiff's harassment claims.

Finally, Plaintiff alleges she was subjected to retaliation after complaining about the magazines she found. To establish a retaliation claim, Plaintiff must "demonstrate: 1) that she engaged in activity protected by the THRA; 2) that the exercise of her protected rights was known to the defendant; 3) that the defendant thereafter took a materially adverse action against her; and 4) there was a casual connection between the protected activity and the materially adverse action." Allen v. McPhee, 240 S.W.3d 803, 820 (Tenn. 2007).

Here, Plaintiff claims that she was subjected to retaliation because after it became known that she had complained about the presence of the magazines, her co-workers shunned or ostracized her by doing such things as not talking to her or eating lunch with her. However, being shunned or ostracized by co-workers does not constitute an adverse employment action. Wilson v. City of Des Moines, 442 F.3d 637, 644 (8th Cir. 2006); Harmon v. Home Depot USA, Inc., 130 Fed. Appx. 902, 904 (9th Cir. 2005); Perez v. Norwegian-Amer. Hosp., Inc. 93 Fed. Appx. 910 (7th Cir. 2004). Accordingly, summary judgment will be granted on Plaintiff's retaliation claim.

31

## III. <u>CONCLUSION</u>

For the foregoing reasons, Defendant TRW's Motion for Summary Judgment (Docket Entry No. 33) will be Granted and this case will be dismissed with prejudice. Plaintiff's "First Motion for Court to Suspend Local Rule 56.01(c)" (Docket Entry No. 51) will be Granted. Defendant's Motion to Strike (Docket Entry No. 51) portions of certain Affidavits filed on behalf of Plaintiff will be Denied, except to the limited portions considered by the Court in accordance with the Court's discussion on pages 15-19 herein.

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE